# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00387-CV

**Jonathan Fish, Appellant**

**v.**

**Celeste Torres Lebrie, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
## NO. D-1-FM-01-02691, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Jonathan Fish and appellee Celeste Torres Lebrie are the parents of B.T.,

who was born in November 1998. When B.T. was born, Fish was seventeen and Lebrie was sixteen.

B.T. and Lebrie lived with Lebrie's parents until 2006, when Lebrie and B.T. moved to the Dallas

area with Lebrie's then-fiancé, whom she has since married. In 2002, Fish and Lebrie signed an

agreed decree of paternity, which named Fish and Lebrie as joint managing conservators, required

Fish to pay child support, and gave Fish increasing visitation with and possession of B.T. Fish was

to end up with standard visitation and possession under the family code after eleven months of

increasing contact.[1] Despite the possession schedule, however, Fish's visitation was inconsistent and

infrequent, and he ceased visitation altogether in about March 2007. In April 2007, Lebrie asked

whether Fish would relinquish his parental rights so that Lebrie's husband could adopt B.T. Fish

---

[1] *See* Tex. Fam. Code Ann. § 153.312 (West Supp. 2010).

initially said he was willing to relinquish his rights, but then changed his mind and in June 2008 filed a motion to enforce the 2002 possession order. Lebrie responded with a petition to modify, asking the court to bar Fish from visitation or, alternatively, to order supervised visitation.

The trial court held two hearings, during which it heard testimony from Fish, Lebrie, their parents and spouses, and B.T.'s guardian ad litem. After the first hearing, held in July 2008, the trial court said, "Mr. Fish, you need to understand that for whatever reason, [B.T.] is fearful of you. I don't know for sure why that is. I suspect that there's some truth in what [Lebrie] has testified to, and I also suspect that perhaps, without intending to, she and her parents have let [B.T.] know that they are very anxious about the possibility of him seeing you." The court ordered that B.T. have counseling and appointed a guardian ad litem to make recommendations. B.T. attended a few counseling sessions after the 2008 hearing, including one session with Fish. Following the second hearing in May 2009, the trial court stated:

> I don't like the way this case has evolved. When we were here last time, I tried to make some orders that I hoped would lead things in a more positive direction. Unfortunately, not only has that not happened but things have gotten worse. . . . My view of this case is right alongside that of the Guardian Ad Litem. I don't believe that Mr. Fish is a bad parent or person. I certainly don't believe that his parents are bad grandparents or people. And I do have serious concern that [B.T.] knows that his mother does not really want him to have a relationship with his father. . . . I just feel that I will be harming [B.T.] emotionally if I make him visit with the paternal side of the family when he's so dead set against it, for whatever reasons.

The court stated that it was not going to order physical contact between Fish and B.T. but noted that B.T. was free to contact Fish if he wished. The court also urged Lebrie to bring B.T. to counseling because "[t]his is a little boy who is severely troubled." The trial court signed an order finding that

2

there was evidence of a history of neglect and abuse by Fish and that visitation with Fish was not in B.T.'s best interest and stating that there would be no court-ordered visitation or physical contact. The court left Fish and Lebrie as B.T.'s joint managing conservators.

Fish appeals, arguing that the trial court abused its discretion in denying him all possession of and access to B.T. Fish asserts that the trial court essentially terminated his parental rights in violation of his constitutional rights.[2] Fish attacks the court's determinations that cutting off visitation is in B.T.'s best interest; that there was evidence of neglect and physical abuse; that visitation would result in B.T.'s abuse, stress, or neglect; that visitation would be detrimental toward fostering a beneficial parent-child relationship between Fish and B.T.; and that B.T. does not wish to have visitation with Fish. Having carefully reviewed the record, we conclude that although the trial court reasonably could have determined that contact between Fish and B.T. should be controlled, limited, and supervised, in completely cutting off all physical interaction between the two until B.T. is an adult or until Fish can prove materially and substantially changed circumstances so as to support a motion to modify,[3] the trial court abused its discretion. We therefore reverse the trial court's order and remand the cause to the trial court for reconsideration.

---

[2] Fish presents his arguments in twenty-four issues, but many of those issues overlap. Rather than considering each issue in isolation, we will group the issues together to consider whether the trial court abused its discretion in finding that visitation with Fish was not in B.T.'s best interest and in making the factual determinations that led the court to that conclusion.

[3] *See id.* § 156.101 (West Supp. 2010) (governing motions to modify custody orders).

**Standard of Review**

The trial court has wide discretion in determining the best interests of the child, and we will reverse a trial court's determination only if it acts unreasonably, arbitrarily, or without reference to guiding principles. *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). We will not reverse merely because we disagree with the trial court's decision. *Id.* When we consider whether a trial court abused its discretion, we do not view legal and factual sufficiency as independent grounds of error but as factors relevant to our assessment. *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.) (quoting *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet.)); *see also In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g) ("In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion?"); *Jenkins v. Jenkins*, 16 S.W.3d 473, 478 (Tex. App.—El Paso 2000, no pet.) (same). Because the trial court is best situated to observe witnesses' demeanor and other indicia that cannot be discerned from the appellate record, we will generally defer to the court's decision so long as it is supported by substantive and probative evidence. *Jenkins*, 16 S.W.3d at 477.

When a trial court is asked to determine issues related to possession of and access to a child, its primary consideration must be the child's best interest. *See* Tex. Fam. Code Ann. § 153.002 (West 2008). A trial court may modify an order on conservatorship or possession and

4

access if it finds that the modification is in the child's best interest and the circumstances of the child or a conservator have materially and substantially changed. *Id.* § 156.101 (West Supp. 2010). In determining what is in the child's best interest, the trial court should consider: the child's wishes; the child's present and future emotional and physical needs; any emotional and physical dangers posed to the child now and in the future; the parties' parenting abilities and any programs or resources available to help the parties promote the child's best interest; the parties' plans for the child; the stability of the various options put forth by the parties; acts or omissions by the parties that would show that the existing parent-child relationship is not a proper one; and any excuse for those acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[4] Although the child's best interest is of primary importance, it is not the only consideration in determining the extent of a parent's access to his child. *See Reno v. Flores*, 507 U.S. 292, 303-04 (1993) ("'The best interests of the child,' . . . is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterion—much less the sole *constitutional* criterion—for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others."). In a custody determination, "[s]o long as certain minimum requirements of child care are met, the interests of the child may be

---

[4] The family code does not define the factors to apply in determining whether a modification is in the child's best interest, but in other contexts involving "best interest" analyses, courts look to *Holley v. Adams*, a termination case in which the supreme court set out a non-exhaustive list of factors for determining a child's best interest. 544 S.W.2d 367, 371-72 (Tex. 1976); *see In re Doe 2*, 19 S.W.3d 278, 282 (Tex. 2000) (applying *Holley* factors in judicial bypass case); *Zeifman v. Michels*, 212 S.W.3d 582, 595 (Tex. App.—Austin 2006, no pet.) (applying *Holley* factors in suit involving modification of conservatorship); *In re N.A.S.*, 100 S.W.3d 670, 672-73 (Tex. App.—Dallas 2003, no pet.) (applying *Holley* factors to grandparent access determination).

subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves." *Id*. at 304.

"[T]he relationship between parent and child is constitutionally protected," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), and a parent's right to the care and custody of his child is a fundamental liberty interest more precious than property rights, *In re M.S.*, 115 S.W.3d 534, 547-48 (Tex. 2003) (citing *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). Complete denial of parental access amounts to a near-termination of a parent's rights to his child and should be reserved for situations rising nearly to the level that would call for a termination of parental rights. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2010) (grounds for termination of parental rights). Thus, a "complete denial of access should be rare," *In re Walters*, 39 S.W.3d 280, 287 (Tex. App.—Texarkana 2001, no pet.), and reserved only for "the most extreme of circumstances," *In re E.N.C.*, No. 03-07-00099-CV, 2009 Tex. App. LEXIS 1760, at *46 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.). *See Hale v. Hale*, No. 04-05-00314-CV, 2006 Tex. App. LEXIS 747, at *8 (Tex. App.—San Antonio Jan. 25, 2006, pet. denied) (mem. op.) ("a complete denial of access should be rare" and possessory conservator should not be denied visitation "except in extreme circumstances"); *Green v. Green*, 850 S.W.2d 809, 812 (Tex. App.—El Paso 1993, no writ) (parent's entitlement to periodic visitation with child "cannot be denied except in extreme circumstances"). In such cases, we must find a balance between deferring to the trial court's factual determinations and carefully examining the record for evidence of extreme circumstances, holding the evidence to a higher standard than we would an order that merely limited a parent's access. *E.N.C.*, 2009 Tex. App. LEXIS 1760, at *57-58 (courts should apply a "higher standard . . . in reviewing a complete

denial of access"); *Allison v. Allison*, 660 S.W.2d 134, 137 (Tex. App.—San Antonio 1983, no writ) (citing *Schiesser v. State*, 544 S.W.2d 373, 378 (Tex. 1976)) ("Our Supreme Court has recognized that the natural right which exists between parents and their children is one of constitutional dimensions, therefore, this case must be strictly scrutinized.").

## Factual Summary

Lebrie testified that although the 2002 order set out an increasing visitation schedule, from the beginning, Fish was unreliable and appeared for fewer than half of the scheduled visits. Fish rarely came for his mid-week visit and on weekends, "90 percent of the time [Fish] was not the person who would come pick up my son. It would be his parents who came [and] got him, and he was going to go to their condo. He would tell us when he got home, 'How was your visit with your dad?' And he'd say, 'He wasn't there.'" Lebrie testified that when Fish failed to appear as promised, B.T. "would sit at the window and cry and cry and cry." Eventually, when Fish said he would visit, B.T. would say, "I'm not getting ready, mom. Dad's just telling another one of his stories."

Lebrie said that in 2004, B.T. returned from a visit and said Fish had locked him in a room so Fish could be with friends. She also testified that B.T. said he told Fish he did not want to watch an R-rated scary movie but that Fish "called him a sissy and a girl and a baby and made him watch it." Lebrie testified that when B.T. was between four and five years old, he came home with a bruise on his back from a spanking, and that Fish attempted to discipline B.T. by pulling on B.T.'s ear or pinching his arm hard enough to bruise. When B.T. was six, he told Lebrie that a puppy Fish had gotten for B.T. urinated on the floor, and that Fish "got really mad and started strangling the puppy until the puppy went unconscious, and so [B.T.] started crying. And when [B.T.] started

7

crying, [Fish] spanked him for crying." Lebrie asked B.T. more questions, and B.T. said the dog laid on the floor for "a couple of seconds. He was just whimpering." In mid-2005, B.T. told Lebrie that Fish had given him beer; Lebrie asked Fish about it, and Fish said, "I just gave him a taste."

By late 2005, Fish ceased all communication with Lebrie and B.T. and stopped making any effort to see B.T. In 2007, Lebrie asked Fish if he would relinquish his parental rights so that B.T. could be adopted, and Fish agreed "if he didn't have to pay child support anymore."[5] Fish talked to B.T. on the phone and B.T. said, "I'm not trying to hurt your feelings, I just feel more comfortable with [Lebrie's husband] being my dad." Fish told Lebrie to start the process and the next month stopped paying child support for several years. Lebrie, who was having a difficult pregnancy at the time, started to look into the relinquishment/adoption process but realized it would be expensive, so the issue was dropped until April 2008, when Fish emailed to ask what Lebrie had decided. Lebrie said she wanted to go forward with the relinquishment and asked Fish to pay an attorney's retainer fee that was equivalent to the child support Fish owed. Fish initially agreed to pay the fee but then served Lebrie with a petition asserting that she was keeping Fish from visiting B.T. Lebrie denied barring Fish from visitation, but she admitted that after B.T. said he had been spanked or pinched, she would tell Fish he could not see B.T.

---

[5] At the final hearing, Lebrie introduced into evidence an email from Fish in which Fish said, "If I make a payment [of child support], I'm going to demand visitation. You didn't want me to put [B.T.] through all that, but you're not giving me a choice." Fish said Lebrie was supposed to send "demands as far as child support and adoption, under the assumption that you're actually serious about the adoption." Fish said he was not going to continue to pay child support "when you haven't let me see [B.T.] in over a year. Its [sic] not fair that you're wanting me to pay up when you haven't let me see him. When I do want to see him, there is always some excuse as to why 'he' doesn't want to. . . . If you don't have any intentions of adoption, then I'm going to demand visitation."

Lebrie testified that the week of the 2008 hearing had been very hard on B.T., who told Lebrie "that [Fish] used to slap him, and that if he would cry, that he would slap him harder. He told me that he got spankings if he would pee on the toilet seat when he was still learning how to pee. He told me that if he left a cheese wrapper . . . on the counter, that he would get spanked really bad for that. He also wet his bed two days ago, I mean, because he was scared to see [Fish]." Lebrie said she loved Fish's parents and had always been open to letting them have visitation with B.T. She also said that she had always been open to allowing Fish to have visitation and that she used to beg and plead with him to be a good father. Lebrie said she had refused to allow Fish's parents to take B.T. on a recent family trip because B.T. said he did not want to go if Fish was going to be there. Lebrie testified that B.T. "was very stressed out" that the judge would believe Fish instead of B.T. because B.T. was a child. Lebrie also testified that when B.T. "heard that some visitation may occur, he started crying. He didn't want it to happen." She said B.T. was even scared of visits that were supervised by Fish's parents because he thought they "will allow [Fish] to do whatever." B.T. told her, "If in order to see [the Fish grandparents] I have to see [Fish], then I won't see any of them." Lebrie was asked about several photographs Fish produced showing B.T. sitting happily with Fish and his family and agreed that B.T. appeared happy but noted that B.T. was never alone with Fish in the photos.

At the final hearing, Lebrie testified that B.T. started therapy after the 2008 hearing and that his experiences with his therapist had made him distrustful of counseling and adults in general because he felt like he was being manipulated and disbelieved. Lebrie testified that "[w]henever we have a court date or a counseling session that comes up, I have to sleep in [B.T.'s]

room with him. Actually, the day before we came down here for court, [B.T.] was at home for throwing up. He's pretty emotional. He has a recurring dream about [Fish], so I have to sleep in his room, that [Fish] is standing at our pool table with a ski mask and pointing a gun at him." B.T. had also started saying he did not want to have visitation with Fish's parents and grew furious with her when she tried to convince him to see them. Lebrie said that on a recent vacation, B.T. got frightened when he thought he saw Mrs. Fish and thought she was going to take him with her. Lebrie said, "I think . . . that [Fish] was truthful in the fact that he spanked him, he didn't abuse him, he doesn't—you know, but [B.T.] feels like he has been abused. He feels like he is in danger if he has to see him, and he is scared. He is terrified to even talk about it." Because of B.T.'s poor response to therapy and to contact with Fish and his parents, she believed visitation with Fish was not in B.T.'s best interest. She said, "I just want them to give [B.T.] time. He needs time to heal. This counseling wasn't working with him, and one-on-one is like throwing him in the fire. He needs—maybe he needs to age a little bit to understand. I don't know what it is that he needs. All I know is that at this point in time, he's not ready." Lebrie further said, "I do not know why [B.T.] is crazy like this, but I'm being honest when I'm telling you that he is—he is traumatized. He is scared. He has manifested these years of being away from [Fish] into a fear that he cannot handle right now."

Lebrie's father, John Torres, testified that he once saw bruises on B.T.'s back from a spanking and often saw bruises from pinches. Mr. Torres said he spoke to Fish about the bruises, and Fish said that B.T. deserved the spanking. He said he only spoke to Fish once about his treatment of B.T. and admitted that he got very upset. Delores Torres, Lebrie's mother, also testified

10

that she saw bruises on B.T. after visits with Fish and that B.T. would be very quiet when he returned home. Mrs. Torres did not believe visitation was in B.T.'s best interest because of how traumatized B.T. was by things that happened when he was much younger. Both of Lebrie's parents denied ever hearing Lebrie disparage Fish or coach B.T. to lie or have bad feelings about Fish. Lebrie's husband testified that Lebrie had not attempted to alienate B.T. from Fish, that B.T. seems angry about being expected to see Fish, and that B.T.'s resistance has grown during counseling.

Fish testified that he often missed visitations scheduled under the 2002 order because he did not want B.T. to miss Lebrie's family events, Lebrie sometimes told Fish he could not visit B.T. on a scheduled weekend, and Lebrie's father was unpleasant and made visitation difficult. Lebrie's attorney asked, "So you didn't want to get in any sort of altercation with the grandfather, so you just kind of said, 'Well, I'm not going to see my son'?" Fish said, "Correct." Asked whether Lebrie and her family had interfered with his time with B.T., Fish answered, "Yes and no," explaining, "Reason I say no is because there has been times when I have not enforced my visitation or I have not followed through with—I won't say promises, but promises to visit with [B.T.], . . . that I wouldn't go for whatever reason." Fish testified that for some time after the 2002 order was signed, he was able to call B.T. on a cell phone but that Lebrie soon changed the number so Fish could only speak to B.T. when Lebrie was present. Fish said that when Lebrie was listening, B.T. gave short answers and "his whole tone changed." After Lebrie and B.T. moved to Dallas, Fish continued to have irregular contact with B.T., but Fish's parents went to Dallas regularly to see B.T. Fish said that B.T. went on some trips with Fish and his family and that B.T. had fun and enjoyed his visits. Fish testified at the first hearing in late July 2008 that he had not seen B.T. since 2007.

During that last visitation, B.T. stayed with Fish and Fish's parents, but Fish was working and did not spend time with B.T. other than to take some pictures and say he missed B.T.

Fish admitted that once when B.T. was four or five years' old, Fish spanked B.T. for refusing to go to bed. Lebrie later saw a mark on B.T.'s bottom, although Fish did not see marks at the time of the spanking. Fish denied spanking or striking B.T. other than that one incident, and he testified that he has since realized that he was wrong to spank B.T. the way he did and that he has never spanked his daughter, who was born in late 2006. Fish said B.T. lied if he said Fish had hit, pushed, or pinched him on numerous occasions. He also denied forcing B.T. to watch scary movies, saying that one time, B.T. insisted on watching a scary movie after Fish said he did not have to. Fish said that it was B.T.'s idea to watch the movie and that B.T. lied if he said it was Fish's idea. Fish testified that B.T.'s false allegations were the result of Lebrie's coaching.

Fish was asked about a conversation he had with B.T. in May or June 2008, in which B.T. said that he did not want to see Fish and that he wanted to be adopted by Lebrie's husband. Fish said B.T. "sounded like a robot, saying, 'I do not want to see you anymore.' Instead of a way a normal person talks, where it's just flowing out." Fish believed B.T. had been manipulated into saying he wanted to cut ties to Fish. Although Fish initially agreed to go along with B.T.'s expressed wishes, he later decided not to relinquish his parental rights because he wants his young daughter to know B.T. as her older brother and hopes to build with B.T. the kind of relationship that he has with his daughter. Fish testified that although B.T.'s last name was legally changed to Fish in the 2002 order, Lebrie enrolled B.T. in school and activities under her maiden or married names, which Fish believed made B.T. think he was not part of Fish's family. Lebrie, however, said she always

12

put Fish on B.T.'s official paperwork and said B.T. signed his homework Torres or Lebrie, saying, "That's at his own will. That's what he wants his name to be."

At the 2009 hearing, Fish testified about his interactions with B.T. during their joint counseling session that occurred sometime after the 2008 hearing. B.T. told Fish that it had hurt his feelings when Fish called him names, and Fish apologized and said he did not mean to hurt B.T. Fish also testified that B.T. came to the therapy session with a list of questions for Fish, asking "why did I make him watch Star Wars movies, why did I make him eat pizza. And what was—what we later found out in that session, was his definition of abuse, was that I made him play video games until, you know, the next morning, all night, and I made him watch Star Wars movies whenever we were at the house, and I made him eat pizza even though it wasn't healthy for him." B.T. never complained that Fish hurt him physically. Fish denied choking a dog into unconsciousness, as testified to by Lebrie. He said that in their therapy session, B.T. recalled that several years earlier, when the dog urinated inside Fish's house, Fish rubbed the dog's nose in the urine and picked him up by the scruff of his neck to put him outside. When Fish told B.T. that Lebrie said Fish had choked the dog into unconsciousness, B.T. "had a shocked look on his face and he said, 'I never said that. That's not true. I never said that.'"[6] Fish admitted that B.T. cried during the counseling session and agreed that B.T. "told you to your face that he doesn't want to see you right now."

---

[6] B.T.'s guardian ad litem, Lorinda Morreale, testified similarly to Fish, saying that during the joint therapy session, B.T. said he may have described the incident to his mother as Fish "choking" the dog, but that "it was basically reframed as his father picking the puppy up by the back of his neck rather than picking him up and physically choking him." She also said that B.T. "acted surprised" when he heard the claim that he said Fish had choked the dog into unconsciousness.

13

Fish testified that after B.T. started therapy, things seemed to go well at first, and that he and B.T. began communicating by email and phone. He and B.T. planned with the counselor to have an in-person visit around Christmas, but B.T. emailed to say "he's not ready just quite yet, but that he does want to schedule a visit at his home in January." The January visit never occurred, however, and Fish said, "I was told that the—that the visits with [B.T.] and the counselor weren't being—weren't happening anymore or as often." Fish believed Lebrie "didn't encourage us visiting and therefore [B.T.] said, 'Well, I'm not ready.'" Lebrie told Fish she was not sure the counselor was the right person to help B.T. because B.T. did not think the counselor believed Fish had abused B.T. Fish said, "In my opinion, she's been delaying this time with me and my son this whole time . . . . There was—there was—we were moving forward to see my son and my relationship with my son was going to start happening again, and I felt that she didn't want that, therefore she wanted to change the counselor." Fish did not believe that visitation would further alienate B.T. and said, "I think that once [B.T.] and I are allowed to be together without having someone hovering or his mother's eyes looking at him, that yeah, I think we'll have a good relationship."

Fish's wife, Melissa Fish, who had lived with Fish since 2005, testified that Fish had never been abusive toward her or their daughter and that he was a very gentle, hands-on father. She also testified that she had seen Fish with B.T. and that B.T. seemed very happy when he was visiting Fish and Fish's parents. However, she had not seen B.T. since late 2006 or early 2007 and saw him "pretty infrequent[ly]" before that.

Maria Fish, Fish's mother and B.T.'s paternal grandmother, testified that their family was very close and that she spent considerable time with Fish, his wife, and his daughter. She had

14

spent time with Fish and B.T. and never saw Fish be physically or verbally abusive, nor had B.T. ever appeared unhappy to be with his father. In her testimony at the 2008 hearing, Mrs. Fish said that she had a friendly relationship with Lebrie and that Lebrie's mother and grandmother were very friendly, but that Lebrie's father was "mean." She said that on the day of the 2008 hearing, she was talking with B.T. when Lebrie's father came over, at which point B.T. "stepped from sitting next to me . . . and then has not spoken to us since. I called him, and he looked, and then looked back at them and went to them." Mrs. Fish said she asked Lebrie to keep the relationship the Fish grandparents had with Lebrie and B.T. separate from Lebrie's problems with Fish. Mrs. Fish testified that about three or four months before the 2008 hearing, Lebrie told Mrs. Fish that B.T. was afraid of Fish and that about five years earlier Fish had spanked B.T. hard enough to leave bruises. Up until the 2008 hearing, the Fishes drove to Dallas to see B.T. about once a month, but since the 2008 hearing, Lebrie had cut off contact between the Fishes and B.T. When they called, Lebrie's husband would tell them that B.T. "was uncomfortable and not ready to speak to us." Mark Fish, Fish's father and B.T.'s paternal grandfather, testified at the 2008 hearing that he and his wife had a good relationship with B.T., that B.T. never expressed any concerns about Fish, and that he thought B.T. "would have just come out and told me if he was scared of his daddy."

Lorinda Morreale, B.T.'s appointed guardian ad litem, testified that she met with B.T. three times, with Fish twice, and with Lebrie three times, and that she observed Fish and B.T.'s interaction once, during their joint counseling session. Morreale said the interaction between Fish and B.T. was strained, and at the beginning, B.T. cried and locked himself in the bathroom, "struggling with even going into the session." She said when he finally went into the session, he

needed several breaks when he became upset while listening to Fish. Morreale said B.T. was sensitive and had a very close relationship with Lebrie. Asked whether B.T. was afraid of Fish, she answered, "I would describe it more as an anxiety about the expectations of the relationship rather than a direct fear that he's going to do something to him." She also said, "I can say that he's uncomfortable, that he's obviously in some level of distress. But whether he's expressing fear or not, I can't really say, honestly." She said that during the time she had been meeting with B.T., he had become more anxious about seeing Fish. Morreale said that B.T.

> didn't want to see his dad, he didn't want to have a relationship with his dad, and also expressed some generalized anxieties about any kind of contact with his dad or his dad's family, to the point where he was describing difficulty sleeping and seeing people that weren't there. And those things concerned me a great deal, because it seemed like this was becoming something more than simply about his having a relationship with his dad and his dad's family and is now growing into some other anxiety concerns for [B.T.].

Morreale said, "I don't have any information to suggest that [Fish] was ever inappropriate or abusive." However, she said B.T. had, over a period of several years, expressed the desire to be adopted by Lebrie's husband and was becoming more stressed and anxious as time went on without the adoption and with instead being urged to spend time with Fish. She said, "I think he'd be fine if we hadn't spent two years of buildup of his perceptions or misperceptions of the experiences he's had with his dad." She recommended

> there to be no contact and no scheduled contact between [B.T.] and [Fish]. Again, not because [Fish] is a bad person or has done anything abusive to him but because [Fish] has in the past told [B.T.] that he would respect what he wanted, he would respond to what he wanted. [B.T.] has told him now two times very specifically and

16

clearly . . . . And so I don't see how, with respecting and following through with what they have already pre-established in the nature of that relationship, how it would be good for [B.T.] to then have his wishes and thoughts ignored and not be respected and responded to.

**Analysis**

When one parent seeks to deny the other parent all access to or possession of their child, the parent advocating for denial of access has the "onerous burden to show that access by [the appealing parent] would endanger [the child's] physical health or significantly impair [his] emotional development." *Allison*, 660 S.W.2d at 137-38; *see E.N.C.*, 2009 Tex. App. LEXIS 1760, at *57-58. As we have noted, when a trial court denies a parent all contact with his child, we must carefully examine the record for evidence of extreme circumstances, holding such evidence to a higher standard than we would if the order had simply placed limits on the parent's access.[7] *E.N.C.*, 2009 Tex. App. LEXIS 1760, at *57-58; *Allison*, 660 S.W.2d at 137. In the provisions that govern when a parent is appointed a possessory conservator instead of a managing conservator, the family

---

[7] Under the family code, there is a presumption that both parents should be appointed joint managing conservators, provided that their appointment is in the child's best interest. *See* Tex. Fam. Code Ann. § 153.133 (West Supp. 2010) (appointment of parents as joint managing conservators when parents file agreed parenting plan), §153.134 (West 2008) (appointment of joint managing conservators without agreed plan). In determining whether joint managing conservatorship is in the child's best interest, the court should consider the child's emotional and physical needs, the parents' ability to act in the child's best interest, whether the parents can encourage and accept a positive relationship between the child and the other parent, the parents' past participation in child-rearing, the preference of a child older than twelve, the parents' locations, and any other relevant factors. *Id.* § 153.134(a). If the appointment of a parent as joint managing conservator is not in the child's best interest, there is a statutory presumption that the parent should instead be appointed possessory conservator, *id.* § 153.191 (West 2008), in which case the court should impose minimal restrictions on the parent's possession of or access to the child, *id.* § 153.193 (West 2008).

code mandates that the terms of an order denying or limiting a parent's possession of or access to a child "may not exceed those that are required to protect the best interest of the child." Tex. Fam. Code Ann. § 153.193 (West 2008). We can conceive of no reason why this standard would not apply in cases involving a managing conservator's access and possession.

Cases involving complete denial of access are rare and usually reversed on appeal. We have found only one case in which a trial court's complete denial of access was affirmed. *See Green*, 850 S.W.2d at 813. In that case, there was evidence that the child was frightened of the father and that the father was illogical and incoherent, was "mean" to the child, threatened the mother, used vulgar language, and wore only a t-shirt in front of the child. *Id.* Further, a psychologist believed the father could be harmful to the child and recommended that there be no visitation if the child so wished. *Id.* The psychologist's report, which the court described as "most graphic," said that the father was "currently rather dangerous to himself or others" and that there was a considerable risk that the father would act "destructively to himself or others." *Id.* at 813 n.3.

In virtually every other case in which a trial court ordered a complete denial of access, the appellate court has reversed the trial court, remanding for the trial court's reconsideration and determination of the appropriate amount and type of access and any necessary conditions.[8] *See, e.g.,*

---

[8] Even in cases involving abusive, erratic, or other harmful behavior, parents are usually allowed limited visitation; those limits are generally affirmed on appeal. *See Ohendalski v. Ohendalski*, 203 S.W.3d 910, 915-16 (Tex. App.—Beaumont 2006, no pet.) (affirming order that deviated from standard possession order and prohibited father from driving with children; father committed family violence in presence of at least one child, had history of chronic alcohol abuse, drank during supervised visitations, and "terrorized one or more of the children by operating a vehicle while under the influence"); *In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *11-20, 35-36 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (affirming order giving mother limited, supervised visitation if she began and continued psychological treatment;

*E.N.C.*, 2009 Tex. App. LEXIS 1760, at *57-58; *Panozzo v. Panozzo*, 904 S.W.2d 780, 784 (Tex. App.—Corpus Christi 1995, no writ); *Allison*, 660 S.W.2d at 138; *see also Walters*, 39 S.W.3d at 287 (if trial court had intended to completely deny access, evidence would not support denial, but review of order showed court intended only to restrict access, not deny it); *Roosth v. Roosth*, 889 S.W.2d 445, 452 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (unenforceable order that gave opposing parent absolute discretion to allow visitation amounted to denial of access, which was unsupported by evidence).[9]

mother had psychological disorders, including uncontrollable anger, caused scene and screamed at daughter in public, expressed "a lot of hate" toward daughter, hid tape recorder in son's bag and instructed son to provoke fight with father, and "caused mental and emotional damage to her children"); *Sedgwick v. Sedgwick*, No. 05-01-00711-CV, 2002 Tex. App. LEXIS 2789, at *14-16 (Tex. App.—Dallas Apr. 22, 2002, no pet.) (not designated for publication) (affirming order giving mother limited, supervised visitation; mother was described as emotionally volatile and controlling, threatened to throw child overboard and watch her drown, repeatedly obstructed father's possession of child, and failed to comply with earlier visitation orders); *Enos v. Enos*, No. 14-97-00159-CV, 1998 Tex. App. LEXIS 2270, at *10-22 (Tex. App.—Houston [14th Dist.] Apr. 16, 1998, no pet.) (not designated for publication) (affirming order giving mother only one hour of supervised visitation per month; mother was emotionally unstable and manipulative, children were distressed by visits, counselor and psychologist testified that children's exposure to mother should be limited, and mother often failed to appear for visitations); *Hopkins v. Hopkins*, 853 S.W.2d 134, 138 (Tex. App.—Corpus Christi 1993, no writ) (affirming order giving father two hours of supervised visitation every other week; father had been convicted of drug delivery, used drugs in front of children, severely abused mother and threatened her with gun, hit older child, neglected children, denied treatment to child who suffered head injury while in father's care, kept extremely unsanitary house, and behaved erratically, including waking "from a nap to discover the oldest child's face covered with blood").

[9] Several cases hold that custody orders that do not provide specific conditions to be met before visitation may occur or that give an opposing party absolute discretion to decide whether visitation will occur are enforceable and amount to effective denials of access, requiring sufficient supporting evidence. *See Roosth v. Roosth*, 889 S.W.2d 445, 452 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see also Hale v. Hale*, No. 04-05-00314-CV, 2006 Tex. App. LEXIS 747, at *9-10 (Tex. App.—San Antonio Jan. 25, 2006, pet. denied) (mem. op.); *Hill v. Hill*, 404 S.W.2d 641, 643 (Tex. Civ. App.—Houston [1st Dist.] 1966, no writ). *Cf. Sedgwick*, 2002 Tex. App. LEXIS 2789, at *14-16 (holding that order providing for visitation at times "mutually agreed to" by parents did not leave visitation to father's sole discretion and was enforceable if father was unreasonable).

19

In *Walters*, the court of appeals reversed a trial court's denial of access despite the fact that the mother was an alcoholic who had attempted to conceal her drinking and had passed out drunk while the child was in her care. 39 S.W.3d at 283. The court held that the trial court's appointment of the mother as possessory conservator implied that any risk she posed to the child "can be remedied by an order that restricts her possession." *Id.* at 287. The court concluded that although limitations would be appropriate, "complete denial of access [was] not warranted." *Id.*

Similarly, in *E.N.C.*, this Court concluded that "though the evidence presented at trial would support a decision to limit [the biological mother's] rights of access and possession, it does not demonstrate the presence of extreme circumstances needed to justify a denial of all access and possession." 2009 Tex. App. LEXIS 1760, at *49. In that case, there was evidence that the mother had been involved in multiple abusive relationships; that she might have initiated some of the violence in one of those relationships; that the child's older sibling was sometimes present and witnessed violence against the mother; that the child's father, who was extremely abusive to the mother and with whom the mother repeatedly reconciled, had sexually abused his former stepdaughter and had physically abused the child's older sibling; and that the child's sibling was emotionally upset by witnessing the mother being abused. *Id.* at *29-39. We held that the evidence supported a decision to limit the mother's contact with the child but not a complete denial of access, noting there was little evidence that the mother was violent and no evidence that she had harmed her children or would harm the child if given limited access. *Id.* at *49-50, *53-54. We concluded that because the evidence showed "that a less restrictive determination regarding access and possession, such as supervised visitation, could be ordered and still address any potential safety concerns," the

20

trial court abused its discretion in denying the mother all access and possession. *Id.* at *57-58. We reversed the order on access and remanded the case to the trial court to "determine what amount and type of access are appropriate under these circumstances." *Id.* at *58.

The facts in this case would certainly warrant limitations on Fish's contact with B.T. However, we have reviewed this record carefully, and Fish's conduct as a very young parent several years before he or Lebrie filed their petitions to modify does not amount to the kind of "extreme circumstances" that would justify utterly denying him access to B.T. Despite the trial court's finding of a "history" of neglect or abuse, Lebrie, the guardian ad litem, and even the trial court all stated that they did not believe Fish was abusive or a bad person. Further, there was no evidence that Fish was unstable or a danger to himself, B.T., or anyone else. Fish's admission to parental shortcomings when he was a very young father, his testimony that he had since learned how to be a better parent, and evidence of his good relationship with his daughter all support a conclusion that these are not the "extreme circumstances" requiring a complete denial of access.

Certainly the record supports a conclusion that B.T. is a very sensitive child who needs to work through anxiety he has built up related to Fish. B.T.'s mother, maternal grandparents, and guardian ad litem testified that he had grown upset during his short course of therapy sessions, but there was no testimony or reports by B.T.'s therapist or a child psychologist to explain whether B.T. had made progress or that B.T. was not capable of working through his anxiety. Certainly the trial court could conclude that B.T.'s best interest will be served by a combination of limited contact, supervised visits, and therapy. *See* Tex. Fam. Code Ann. § 153.002 (child's best interest is primary consideration in conservatorship and possession determinations). However, we cannot disregard

21

Fish's rights as a parent, *see Troxel v. Granville*, 530 U.S. 57, 66 (2000), nor should we ignore the fact that, as recognized by the family code, there is an important public policy promoting parents' involvement in their children's lives, *see* Tex. Fam. Code Ann. § 153.001(a) (West 2008) (Texas's public policy is to assure that children have frequent and continuing contact with parents who can act in child's best interest, provide child with safe and stable environment, and to encourage parents to share in rights and duties of child-rearing); *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (presumption that child's best interest is served by giving parents custody is based on "natural affection usually flowing between parent and child" and "is deeply embedded in Texas law"). The court could have crafted an order that would protect B.T.'s emotional and physical well-being, perhaps through court-ordered therapy and close monitoring, while allowing Fish and B.T. to slowly rebuild a relationship through limited, supervised visitation, with an eye to increasing contact if and when B.T. shows himself ready. *See* Tex. Fam. Code Ann. § 153.193 (order limiting parent's possession of or access to child "may not exceed those [limitations] that are required to protect the best interest of the child"). Instead, the court focused exclusively on B.T.'s immediate best interest, without regard to Fish's rights or B.T.'s long-term interest in dealing with his anxiety and having a relationship with his father, issuing a blanket denial of access that Fish will not be able to have modified unless he can carry the burden of showing substantially and materially changed circumstances in the future. *See id*. § 156.101(a); *In re A.L.E.*, 279 S.W.3d 424, 428-29 (Tex. App.—Houston [14th Dist.] 2009, no pet.). On this record, we hold that the trial court abused its discretion in entering an order not supported by the kind of evidence that would allow for a complete denial of access.

## Conclusion

Because the order denying Fish all access to and possession of B.T. was an abuse of discretion, we reverse the trial court's order and remand the cause to the trial court to consider what amount and kind of access would be appropriate, as well as any other safeguards to help B.T. work through his anxiety and to protect his well-being.[10]

_____

David Puryear,  Justice

Before Justices Patterson, Puryear and Pemberton

Reversed and Remanded

Filed:   December 10, 2010

---

[10]  We dismiss Fish's motion to expedite.